WINGS FIELD PRESERVATION
ASSOCIATES, L.P.,
Petitioner,

v.

COMMONWEALTH of Pennsylvania,
DEPARTMENT OF TRANSPORTA-
TION, Montgomery County and Whit-
pain Township, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 8, 2000.
Decided May 2, 2001.

**314**

Kevin J. McKeon, Harrisburg, for petitioner.

Gwendolyn T. Mosley, Harrisburg, for respondent, Department of Transportation.

J. Pierce Anderson, Blue Bell, for respondent, Whitpain Township.

Before FRIEDMAN, Judge, KELLEY, Judge, McCLOSKEY, Senior Judge.

KELLEY, Judge.[1]

Wings Field Preservation Associates, L.P., (Wings Field) has filed a motion for partial summary judgment (Wings Field Motion) in connection with the petition for review in the nature of a complaint for declaratory judgment (Petition) previously filed by Wings Field in this Court's original jurisdiction. The Commonwealth of Pennsylvania, Department of Transportation (DOT), also has filed a motion for summary judgment (DOT's Motion) with respect to the Wings Field Petition. Both motions are presently before this Court for disposition.[2] We grant summary judgment in favor of Wings Field.

The following material facts are undisputed. Wings Field is the owner of Wings Field Airport (Airport), a seventy-year-old privately owned, public use airport located in Whitpain Township (Township), Montgomery County. In June 1999, Wings Field submitted a pre-application to DOT seeking a grant to pay for a runway project at the Airport. DOT would not consider the request because Wings Field lacked the township and county approvals required by Section 2210 of the County Code.[3] On July 29, 1999, the Township

---

1. The instant case was reassigned to the author on October 3, 2000.

2. After the pleadings are closed, as here, "any party may move for summary judgment in whole or in part as a matter of law ... whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa. R.C.P. No. 1035.2(1).

3. Section 2210 of The County Code, Act of August 9, 1955, P.L. 323, *added by* Section 4 of the Act of June 18, 1998, P.L. 619, 16 P.S. § 2210, states:

No Federal or State money from the Aviation Restricted Revenue Account in the Motor License Fund or any other State money may be expended for airport operations or airport development in any county of the second class A having a population in excess of 675,000 persons without the approv-

voted not to approve the project, and, because of the Township's action, Montgomery County decided not to consider the project.[4]

On September 3, 1999, Wings Field filed its Petition in this Court's original jurisdiction, seeking a declaratory judgment.[5] Specifically, Wings Field asked this Court to declare Section 2210 of the County Code unconstitutional because: (1) it is special legislation prohibited by Article III, Section 32 of the Pennsylvania Constitution;[6] (2) it violates Wings Field's equal protection rights under the Pennsylvania and United States Constitutions, and; (3) it violates Wings Field's due process rights under the Pennsylvania and United States Constitutions.

On December 23, 1999, Wings Field filed its motion for partial summary judgment,[7] and DOT subsequently filed its motion for summary judgment.

## I. Special Law

The first issue presented is whether Section 2210 of the County Code is unconstitutional because it is special legislation prohibited by Article III, Section 32 of the Pennsylvania Constitution.[8]

---

al of the municipality or municipalities wherein such airport is situated.

Section 1 of the Aviation Code, 74 Pa.C.S. § 5103, establishes the Aviation Restricted Account. Section 530 of the Act of April 9, 1929, P.L. 177, *added by* Section 2 of the Act of July 11, 1996, P.L. 619, 71 P.S. § 210, regulates the funding of the Aviation Restricted Account.

4. The Township argues in its brief that the averments in the Wings Field Motion are based improperly on testimonial evidence. Township's brief at 6–9. However, the facts set forth here are based solely on admissions contained in the pleadings. *See* Petition, paras. 2, 22, 33, 35, 41–42, exh. B; Township's Answer, paras. 2, 22, 33, 41–42; County's Answer, paras. 2, 33, 35, 42; DOT's Answer, paras. 2, 33.

5. Wings Field also filed an Application for Special Relief in the Nature of a Preliminary Injunction. After a hearing on the matter, this Court issued a Memorandum Opinion and Order, dated October 29, 1999, denying the application.

Subsequently, the Township filed preliminary objections to the Petition, asking this Court to strike certain portions of the Petition and claiming that Wings Field was precluded from seeking a declaratory judgment because it did not appeal the Township's disapproval of the runway project to the Court of Common Pleas of Montgomery County. On December 1, 1999, following argument, this Court issued a Memorandum and Order striking a portion of the Wings Field Petition and overruling the Township's remaining preliminary objections.

6. Article III, Section 32.1 of the Pennsylvania Constitution states, in pertinent part, as follows:

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law ... [r]egulating the affairs of counties, cities, townships, wards, boroughs or school districts....

7. The Township and DOT have filed briefs opposing the Wings Field Motion; however, *Montgomery County has stated in its brief* that it takes no position on the merits of the Wings Field Motion. The Aircraft Owners and Pilots Association, the National Air Transportation Association, the National Business Aviation Association and the Aviation Council of Pennsylvania have filed an *amicus* brief in support of the Wings Field Motion.

8. An act of the General Assembly cannot be declared unconstitutional unless it clearly, palpably and plainly violates the constitution; hence, a heavy burden befalls a constitutional challenge to legislative enactments. *Danson v. Casey*, 33 Pa.Cmwlth. 614, 382 A.2d 1238 (1978), *aff'd*, 484 Pa. 415, 399 A.2d 360 (1979).

Our Supreme Court has referred to Article III, Section 32 of the Pennsylvania Constitution as the equal protection portion of the constitution. *See Kroger Co. v. O'Hara Town-*

## A. Article III, Section 32

 Article III, Section 32 of the Pennsylvania Constitution states that the General Assembly shall pass no "special law" regulating the affairs of counties or townships. Our Supreme Court has explained that:

[A] special law is the opposite of a general law. A special law is not uniform throughout the state or applied to a class. A general law is. It is well known that the Legislature has classified cities and counties.[9] A law dealing with all cities or all counties of the same class is not a special law, but a general law, uniform in its application. But a law dealing with but one county of a class consisting of ten, would be local or special.

*Appeal of Torbik,* 548 Pa. 230, 241, 696 A.2d 1141, 1146 (1997) (quoting *Heuchert*

*v. State Harness Racing Commission,* 403 Pa. 440, 446–47, 170 A.2d 332, 336 (1961)).

 When Article III, Section 32 became part of Pennsylvania's constitution in 1873, its purpose was to prevent the General Assembly from creating classifications in order to grant privileges to one person, one company or one county.[10] However, Article III, Section 32 was not intended to prevent the General Assembly from creating statutory classifications to meet diverse needs. *Danson v. Casey,* 33 Pa. Cmwlth. 614, 382 A.2d 1238 (1978), *aff'd,* 484 Pa. 415, 399 A.2d 360 (1979); *Higher Education Assistance Agency v. Abington Memorial Hospital,* 24 Pa.Cmwlth. 352, 356 A.2d 837 (1976), *aff'd,* 478 Pa. 514, 387 A.2d 440 (1978). Thus, Article III, Section 32 allows a legislative classification that has some rational relationship to a proper state purpose.[11] *Danson; Tosto v. Penn-*

ship, 481 Pa. 101, 392 A.2d 266 (1978). In fact, our Supreme Court has analyzed Article III, Section 32 and federal equal protection claims simultaneously. *See Harristown Development Corp. v. Department of General Services,* 532 Pa. 45, 614 A.2d 1128 (1992). However, the Court has also stated that the language of Article III, Section 32 is substantially different from the equal protection clause of the federal constitution, and that we are not free to treat that language as though it was not there. *See Kroger.* Thus, our analysis will focus on the language of Article III, Section 32 of the Pennsylvania Constitution.

9. The General Assembly has divided the counties of the Commonwealth into nine classes based on the population figures of the United States census. Sections 210 and 211 of the County Code, 16 P.S. §§ 210 and 211. Second class counties A are those counties having a population of 500,000 and more but less than 800,000 inhabitants. Section 210(2.1) of the County Code.

10. *See* Dale F. Rubin, *Public Aid to Professional Sports Teams A Constitutional Disgrace: The Battle to Revive Judicial Rulings and State Constitutional Enactments Prohibiting Public Subsidies to Private Corporations,* 30 U. Tol.

L.Rev. 393, 399–400 (1999); *see also* Robert E. Woodside, *Pennsylvania Constitutional Law* 576–77 (1985) (stating that, in the period leading up to 1873, most of the local or special acts conferred a direct benefit on an individual or corporation); and *Higher Education Assistance Agency v. Abington Memorial Hospital,* 24 Pa.Cmwlth. 352, 356 A.2d 837 (Pa.Cmwlth.1976), *aff'd,* 478 Pa. 514, 387 A.2d 440 (1978) (stating that the purpose of Article III, Section 32 was to put an end to the flood of privileged legislation for particular localities and for private purposes).

11. [C]lassification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones, used for the purpose of evading the constitutional prohibition. If the distinctions are genuine, the courts cannot declare the classification void, though they may not consider it to be on a sound basis. The test is not wisdom, but good faith in the classification.
*In re Annual Audit and Financial Report of Township of Penn, Westmoreland County, Pennsylvania for the Year 1984,* 116 Pa. Cmwlth. 381, 543 A.2d 171, 173 (1988) (citation omitted).

*sylvania Nursing Home Loan Agency,*
460 Pa. 1, 331 A.2d 198 (1975). Our Supreme Court has explained that:

> Classification is allowed because of necessity [that springs] from manifest peculiarities clearly distinguishing those of one class from each of the other classes and imperatively demanding legislation for each class separately that would be useless and detrimental to the others.

*Allegheny County v. Monzo,* 509 Pa. 26, 44, 500 A.2d 1096, 1105 (1985) (quoting *Commonwealth ex rel. Brown v. Gumbert,* 256 Pa. 531, 100 A. 990 (1917)); *see also Appeal of Ayars,* 122 Pa. 266, 16 A. 356 (1889). It is such manifest peculiarities within a legislative class that provide the only permissible justification for a legislative override of the uniformity required by Article III, Section 32.

Uniformity is a foundational principle upon which our Constitution is based, both generally, and specifically in relation to local government.[12] This uniformity is the crux of the issue at hand. When dealing with distinctions based upon population, Article III, Section 20 of the Pennsylvania Constitution makes clear that only "laws passed relating to *each class* . . . shall be deemed general legislation." (Emphasis provided). The classes referenced in that language are those that Article III, Section 20 empowers the General Assembly to establish, namely, those dividing the counties of Pennsylvania into nine population-based classes as established in Sections 210 and 211 of the County Code. The establishment of those classes by the General Assembly, pursuant to the grant of authority of Article III, Section 20, enables the General Assembly to employ flexibility in addressing the unique needs of diversely populated counties throughout the Commonwealth in such a way as to treat similarly populated counties with the uniformity that our Constitution requires.

Any argument that legislation such as Section 2210 is necessary to provide the General Assembly with added flexibility in dealing with diverse needs among municipalities serving varying population levels is refuted by an examination of the prior provisions of the earlier constitutional section corresponding to Article III, Section 20. Former Section 34 of Article III empowered the General Assembly to classify municipalities within our Commonwealth with language identical to present Section 20 of Article III, with one notable exception: former Section 34 specifically restricted the number of classes that could be employed by the General Assembly in dividing the various municipalities within the Commonwealth. By replacing former Section 34 with current Section 20 in 1923, the General Assembly eliminated the restrictions on the number of legislative classifications, thereby freeing the General Assembly to divide counties and other municipalities into as many classes as the General Assembly deemed necessary. The requirement of uniformity within those classifications was also part of the content of former Section 34, and remains in current Section 20. If the General Assembly were to find that a particular class's needs were not being met by the current classifications contained in Sections 210 and 211 of the County Code, they are, since 1923, free to amend those Sections. With Section 2210, however, the General Assembly's treatment of the class established in Section 210 of the County Code fails on its face to meet Article III,

---

**12.** In addition to our Supreme Court's explanation of Article III, Section 32's uniformity requirement, Article IX, Section 1 of the Pennsylvania Constitution expressly mandates that the General Assembly's provision by general law "shall be uniform as to all classes of local government regarding procedural matters."

Section 32's clear mandate to uniformly relate Section 2210 to the class to which it applies.[13]

## B. Section 2210 of the County Code

On April 22, 1998, the General Assembly enacted House Bill No. 2281 as the General Appropriation Act of 1998 (Appropriation Act), Act of April 22, 1998, P.L. 1341. Section 821 of the Appropriation Act stated that local approval would be required for the expenditure of federal or state money for airports "in a county of the second class A." Thus, as of April 22, 1998, all three counties of the second class A possessed the right of local approval for airport funding. However, less than two months later, on June 18, 1998, the General Assembly enacted Senate Bill No. 220, which repealed Section 821's local approval provision and added Section 2210 to the County Code.

▇▇▇ Section 2210 of the County Code prohibits the expenditure of federal or state money for airport operations or development "in any county of the second class A having a population in excess of 675,000 persons without the approval of the municipality or municipalities wherein such airport is situated." 16 P.S. § 2210. The parties have stipulated that Montgomery County is the only county of the second class A with a population in excess of 675,000 persons. Memorandum Opinion of 10/29/99 at 2. Bucks County and Delaware County are also counties of the second class A, but they have fewer than 675,000 persons.[14]

In the case *sub judice,* then, our initial mandate is to simply inquire whether the law in question is "not uniform . . . [as] applied to a class." *Appeal of Torbik,* 548 Pa. at 241, 696 A.2d at 1146 (citations omitted).

▇▇▇ Section 2210 does not establish a new class such as those defined in Section 210 of the County Code. Additionally, Section 2210 does not modify the classes established in Section 210 as provided for in Section 211 of the County Code. What Section 2210 does do is to vest in one county a singular and unique power that cannot be exercised by all of the members of the class to which that one county has already been legislatively assigned. That the classification in the instant case concerns a single county that is a member of a class comprised of three counties, as contrasted with our Supreme Court's articulation that "a law dealing with but one county of a class of ten would be local or special", *Id.,* does not distinguish this case. A law's special or general nature is not dependent upon the size of the class which is not treated uniformly it is determined by that treatment's uniformity, or lack thereof, in relation to the entire class, notwithstanding the number of members therein. In granting to Montgomery County the exclusive power to control the approval of the expenditure of federal or state money for airport operations or de-

---

**13.** The Township argues that Article III, Section 20 creates an exception to the prohibition against special laws. Township's brief at 9. We disagree. Our Supreme Court has recognized that the General Assembly has constitutional authority to classify counties and townships by population; however, despite that authority, the Court has made clear that the General Assembly may not distinguish between *counties within a class* without a valid reason. *Appeal of Torbik; Heuchert.*

**14.** This Court has taken judicial notice that the population of Bucks County in 1990 was 541,174, and, according to the July 1, 1998 estimates of the U.S. Bureau of the Census, the population of Bucks County has risen to 587,942. With respect to Delaware County, its 1990 population of 547,651 has declined to 542,593 as of July 1, 1998. Memorandum Opinion of 10/29/99 at 4–5.

velopment, without granting that same power to the other members of the same class, the General Assembly has enacted a law that is not uniform in its application to the class at issue.

■ We next must inquire whether some manifest peculiarities of Montgomery County clearly distinguish it from the other two counties of its class. *Monzo.* DOT asserts in its brief that, in counties of the second class A with more than 675,000 persons, the burdens and concerns incident to airport development are greater than or different from other counties of the second class A. DOT's brief at 10. The Township echoes DOT's argument in asserting that the most heavily populated suburban counties need separate legislation because of local environmental concerns, traffic control, fire prevention, policing and other community interests. Township's brief at 17.

We do not agree that such local concerns are unique to Montgomery County, to the exclusion of the other two counties in the same class, and we do not agree that these concerns manifest peculiarities endemic solely to Montgomery County. DOT and Township fail to recognize that every local concern listed by them is already addressed by local ordinances and zoning restrictions. Further, local concerns are amply provided for in the grant analysis procedures under which the state and federal grants concerning airport expansion and maintenance are made.[15] The fact that safeguards regarding these local concerns exist independently of Section 2210, and apply to all three counties of the class at issue, further evidence an absence of any articulable manifest peculiarities that distinguish Montgomery County from the other members of its class.

Accordingly, Section 2210 is special legislation under the mandate of Article III, Section 32, the classifications of Article III, Section 20, and the precedents of our Supreme Court. We therefore grant Wings Field's Motion, and deny DOT's Motion, on this issue.

## II. Equal Protection

■ Notwithstanding the previous dispositive analysis and conclusion, we turn now to the second issue before us: whether Section 2210 of the County Code is unconstitutional because it violates Wings Field's equal protection rights.[16]

■ Because the classification in Section 2210 of the County Code does not implicate a suspect class, a fundamental right, an important right or a sensitive classification, the provision will be upheld if there is any rational basis for the classification. *See Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265 (1995). In applying the rational basis test, Pennsylvania courts have adopted a two-step analysis. First, we must determine whether Section 2210 of the County Code seeks to promote any legitimate state interest or public value. *Id.* If so, we must next determine whether the classification adopted in Section 2210 of the County Code is reasonably related

---

15. *See generally,* 67 Pa.Code 473.8 (establishing as a factor in the grant selection process the impact of an airport project on the local area in which it is located); 67 Pa.Code 473.10 (requiring the acquisition of all necessary permits and licenses from local agencies as a condition precedent to receiving a grant).

16. The Fourteenth Amendment to the U.S. Constitution provides that no State shall deny

to any person within its jurisdiction the equal protection of the laws. Article I, Section 1 of the Pennsylvania Constitution provides that all are born equally free and independent and have certain inherent and indefeasible rights, among which are those of acquiring, possessing and protecting property and of pursuing happiness.

to accomplishing that articulated state interest. *Id.*

Section 2210 of the County Code essentially gives municipalities in counties with populations of 675,000 to 800,000 veto power over the expenditure of state and federal government funds for the operation and development of airports located within those municipalities. We can conceive of no legitimate state interest in giving any municipality *total* control over airport funding decisions.

With respect to federal funds, we note with alarm that the Commonwealth's participation in the federal government's state block grant program is governed by 49 U.S.C. § 47128. Subsection (a) of that provision authorizes the promulgation of regulations to carry out the state block grant program. The regulation at 14 C.F.R. § 156.6(c) states:

> Unless otherwise agreed by a participating State and the [federal] Administrator in writing, a participating State shall not delegate or relinquish, either expressly or by implication, any State authority, rights, or power that would interfere with the State's ability to comply with the terms of a State block grant agreement.

Section 47128(c) of the federal statute requires that, in administering the state block grant program, the Commonwealth must provide for "meeting critical safety and security needs and ... [address] the needs of the national airport system...." 49 U.S.C. § 47128(c).

Where, as here, the Commonwealth has relinquished some of its power over airport funding to certain municipalities, the Commonwealth has also relinquished its ability to provide for meeting critical airport safety and security needs or to address national airport system needs with respect to particular airports. The municipalities will control funding for their own airports, and

Section 2210 of the County Code does not require that those municipalities consider critical airport safety and security needs or national airport system needs in deciding whether to approve airport funding. Unless the Commonwealth has a written agreement with the federal government allowing for the relinquishment of power to municipalities in certain counties, Section 2210 of the County Code appears to violate 14 C.F.R. § 156.6(c). Empowering a local municipality to so violate a Commonwealth obligation under a federal statute and regulation is the antithesis of the promotion of a legitimate state interest or public value.

Township attempts to articulate a rational basis for the singular grant to Township of local control contained in Section 2210 by again advancing local concerns, and therefore a need for local control, over environmental, traffic control, fire prevention, and policing matters. As discussed above, however, these local concerns are addressed by pre-existing local ordinances, local zoning restrictions, and federal and state grant analysis procedures applicable to state and federal grants concerning airport expansion and maintenance. No rational basis exists, therefore, for granting further local control to address local concerns that are already addressed by existing ordinances and procedures.

DOT is unable to articulate any rational basis for the classification at issue, averring simply that the General Assembly *could* have determined that the burdens and concerns of airport expansion and development *might* benefit from local input. While the General Assembly theoretically *could* have made such a determination, it is clear that neither DOT nor Township can conceive of, yet alone articulate, what that benefit *might* be. This Court is also unable to conceive of any potential rational basis for the classification established by

Section 2210, to the exclusion of the other counties within that class. Such an absence of a rational basis for Section 2210 of the County Code merits a grant of Wings Field's Motion, and a denial of DOT's Motion, on this issue.

### III. Delegation

 Notwithstanding the previous dispositive analyses and conclusions, we turn now to the final issue before us: whether Section 2210 of the County Code is unconstitutional because it violates Wings Field's due process rights by delegating authority over airport funding to municipalities without providing guidelines or standards.

 Article II, Section 1 of the Pennsylvania Constitution states that the legislative power of this Commonwealth shall be vested in a General Assembly. The General Assembly may not delegate its legislative power; however, the General Assembly may confer authority and discretion upon another body in connection with the execution of a law. *Chambers Development Co., Inc. v. Commonwealth, ex rel. Allegheny County Health Department,* 81 Pa.Cmwlth. 622, 474 A.2d 728 (1984). In doing so, the legislation must contain adequate standards to guide and restrain the exercise of the delegated administrative function.[17] *DePaul v. Kauffman,* 441 Pa. 386, 272 A.2d 500 (1971); *Chambers Development Co.* To determine whether the General Assembly has established adequate standards, this Court must look to the language of the statute, the underlying purpose of the statute and its reasonable effect. *Executive Life Insurance Co. v. Commonwealth,* 147 Pa.Cmwlth. 105, 606 A.2d 1282 (1992), *aff'd,* 533 Pa. 321, 623 A.2d 322 (1993); *Chambers Development Co.*

The language of Section 2210 of the County Code contains no standards to guide and restrain municipalities in their decisions on airport funding. The provision contains no stated purpose, and the reasonable effect of the provision is that municipalities will make their airport funding decisions based solely on local considerations. This means that municipalities, not the General Assembly, will be making policy choices about airport funding in their localities.[18] Thus, Section 2210 of the County Code permits municipalities to ignore the federal policy, which has been imposed upon the Commonwealth, that airport funding decisions be based, in part, on safety and security needs and the needs of the national airport system.[19] *See* 49 U.S.C. § 47128(c).

---

17. In setting forth standards for guidance, the General Assembly declares legislative policy. *Blackwell v. State Ethics Commission,* 523 Pa. 347, 567 A.2d 630 (1989). Thus, where the General Assembly fails to provide standards for guidance, the General Assembly has improperly delegated legislative power. *Id.*

18. DOT argues that the General Assembly has delegated authority to municipalities only to gather information about the impact of airport development upon a particular municipality. DOT's brief at 12. Clearly, this is not the case. In Section 2210 of the County Code, the General Assembly has given municipalities the power to establish their own policies with respect to funding for airports located in those municipalities.

DOT also argues that municipal government bodies are bound by their oaths of office to act in accordance with the laws of the state and federal government. DOT's brief at 12. However, Section 2210 is a law of the state, and it gives municipalities absolute power over airport funding.

19. The Township argues that the General Assembly had no need to provide standards because the Township has legislative powers for purposes of local self-government under The Second Class Township Code, Act of May 1, 1933, P.L. 103, 53 P.S. §§ 65101–68701. Township's brief at 19–21. However, the legislative power here is the General Assembly's legislative power over federal and state fund-

Because Section 2210 is an improper delegation of legislative power to the Township, we grant the Wings Field Motion and deny DOT's Motion on this issue.

## IV. Conclusion

Accordingly, we grant Wings Field's motion for partial summary judgment, deny DOT's motion for summary judgment, and enter declaratory judgment in favor of Wings Field in accordance with the foregoing opinion.

### ORDER

AND NOW, this 2nd day of May, 2001, it is hereby ordered that: the motion of Wings Field Preservation Associates, L.P. (Wings Field) for partial summary judgment is granted; the motion of Department of Transportation (DOT) for summary judgment is denied, and; declaratory judgment is hereby granted in favor of Wings Field in accordance with the foregoing opinion.

FRIEDMAN, Judge, concurring and dissenting.

I respectfully dissent. The ultimate question with respect to the "special law" and "equal protection" issues is whether the General Assembly created a sub-class of counties of the second class A in order to grant a special privilege to Montgomery County or whether the General Assembly

did so in order to meet the diverse needs of municipalities with airports located in counties having a population between 675,-000 and 800,000. Unlike the majority, I believe there are genuine issues of material fact in this regard, and, thus, I would deny summary judgment as to the "special law" and "equal protection" issues.[1]

Article III, Section 32 of the Pennsylvania Constitution states that the General Assembly shall pass no "special law" regulating the affairs of counties or townships. Our supreme court refers to Article III, Section 32 as the equal protection provision of the Pennsylvania Constitution. *See DeFazio v. Civil Service Commission of Allegheny County,* 562 Pa. 431, 756 A.2d 1103 (2000); *Harristown Development Corp. v. Department of General Services,* 532 Pa. 45, 614 A.2d 1128 (1992); and *Kroger Co. v. O'Hara Township,* 481 Pa. 101, 392 A.2d 266 (1978). "We have repeatedly held that the underlying purpose of [Article III, Section 32] is analogous to the equal protection clause of the federal constitution and that our analysis and interpretation of the clause should be guided by the same principles that apply in interpretation of federal equal protection." *DeFazio,* 562 Pa. at 436, 756 A.2d at 1105.

The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly.[2] How-

---

ing for airports, not the Township's legislative power to self-govern.

1. I agree with the majority that section 2210 of The County Code, Act of August 9, 1955, P.L. 323, *added by* section 4 of the Act of June 18, 1998, P.L. 619, 16 P.S. § 2210, constitutes an improper delegation of legislative power. Therefore, like the majority, I would grant summary judgment on that issue.

2. The majority transforms this concept into a principle of uniformity, i.e., the "uniform" treatment of counties within a defined class of

counties. (Op. at 317, 318–19.) In doing so, the majority relies upon *Appeal of Torbik,* 548 Pa. 230, 241, 696 A.2d 1141, 1146 (1997) (emphasis added), in which our supreme court stated that a "special law is not *uniform* throughout the state or applied to a class." However, the issue in *Torbik* was whether a tax law was special legislation under Article III, Section 32. Thus, the question for the court in *Torbik* implicated Article VIII, Section 1 of the Pennsylvania Constitution, which states that "[a]ll taxes shall be *uniform,* upon the *same class* of subjects, within the territorial limits of the authority levying the tax, and

ever, it does not require that all persons under all circumstances enjoy identical protection under the law. The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, and *does not require equal treatment of people having different needs.* The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference which justifies the classification and have a fair and substantial relationship to the object of the legislation.

*Id.* at 436–37, 756 A.2d at 1106 (quoting *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265 (1995)) (emphasis added).

The legislation at issue here is section 2210 of The County Code (Code), Act of August 9, 1955, P.L. 323, *added by* section 4 of the Act of June 18, 1998, P.L. 619, 16 P.S. § 2210 (emphasis added), which provides:

No Federal or State money from the Aviation Restricted Revenue Account in the Motor License Fund or any other State money may be expended for airport operations or airport development in any county of the second class A *having a population in excess of 675,000 persons* without the approval of the municipality or municipalities wherein such airport is situated.

It is clear from the plain language of section 2210 of the Code that the General Assembly has created a sub-class of counties of the second class A. Our inquiry, then, is whether there is some ground of difference that justifies the sub-classification and has a fair and substantial relationship to the object of the legislation.[3]

The Department of Transportation (DOT) asserts in its brief that, in counties of the second class A with more than 675,000 persons, the burdens and concerns incident to airport development are greater than, or different from, other counties of the second class A. (DOT's brief at 10.)

shall be levied and collected under *general laws."* Pa. Const. art. VIII, § 1 (emphasis added). Because the case before us here does not implicate the uniformity clause of Article VIII, Section 1, I believe it is improper to discuss the "special law" issue in terms of uniformity.

3. The majority states that uniformity of treatment within the class of counties of the second class A is the crux of the matter before us. (Op. at 317, 318–19.) However, after concluding that section 2210 of the Code does not provide for the uniform treatment of counties of the second class A, making it an impermissible "special law" under *Torbik,* the majority proceeds to consider whether there are manifest peculiarities that distinguish Montgomery County from the other counties in its class. (Op. at 318–19.) If the crux of the matter is whether there is uniform treatment within a defined class, and the majority

has determined that there is not uniform treatment and that this is a special rather than a general law, then the majority should have ended its inquiry there.

I also note that, in examining uniformity of treatment within a defined class of counties, the majority states that a law's special or general nature does not depend upon the size of the class. (Op. at 318.) However, the majority's statement completely ignores classes that contain only one county. For example, the majority would hold that any law relating solely to Allegheny County, the only county of the second class, is a general law because the law is applied uniformly within the class. However, it is clear from Pennsylvania's case law that legislation relating only to Allegheny County may be impermissible special legislation. *See Allegheny County v. Monzo,* 509 Pa. 26, 500 A.2d 1096 (1985).

324

Whitpain Township asserts that the most heavily populated suburban counties need separate legislation because of local environmental concerns, traffic control, fire prevention, policing and other community interests. (Township's brief at 17.) These are disputed allegations of fact, and I believe that this court should hear evidence relating to them.[4] Certainly, the truth or falsity of these assertions is material to the outcome of this case. Thus, I do not believe that summary judgment is appropriate as to the "special law" and "equal protection" issues.[5]

4. The majority does not agree that counties of the second class A having a population greater than 675,000 have different concerns or burdens with respect to airport development. (Op. at 319.) However, this is a finding of fact, and the parties have not been given an opportunity to present evidence on the matter. I would not deprive the parties of a chance to prove their case.

5. The majority points out that, under 14 C.F.R. § 156.6(c), the Commonwealth may not relinquish state block grant control to municipalities unless there is a written agreement to that effect. (Op. at 319–20.) The majority then suggests that section 2210 of the Code violates 14 C.F.R. § 156.6(c), and, therefore, section 2210 of the Code does not promote a legitimate state interest. (Op. at 320.) However, until this court takes evidence in this case, we do not know if there is a written agreement or if section 2210 of the Code violates 14 C.F.R. § 156.6(c). Thus, I fail to see the significance of the majority's discussion of the issue.